UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HUGH MacEACHERN,

        Plaintiff,

                                    CASE NO. 15-CV-12448

v.                                HONORABLE GEORGE CARAM STEEH

QUICKEN LOANS, INC, and
TITLE SOURCE, INC.,

        Defendants.

_____/

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 49) AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 69) AS MOOT

*Pro se* plaintiff Hugh MacEachern, a white male, alleges his discharge, at age 59, was based on reverse race and gender discrimination in violation of Title VII and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), as well as for age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), and in retaliation for filing an internal complaint of discrimination and for his activities towards starting a union. Plaintiff also alleges retaliation under the Americans with Disabilities Act ("ADA"), and claims that defendants failed to pay him for overtime in violation of the Fair Labor Standards Act ("FLSA"). Now before the court is defendants' Quicken Loans, Inc.'s ("Quicken Loans") and Title Source, Inc.'s ("Title Source") (collectively "defendants") joint motion for summary judgment. This matter is to be decided upon the written submissions without oral argument pursuant to Local Rule 7.1(f)(2). For the reasons set forth below, defendants' motion for summary judgment shall be granted.

## I. Background

**A.     The Parties**

Defendant Quicken Loans is in the financial services business.  Defendant Title Source is in the title and escrow services business.  Quicken Loans hired plaintiff as an analyst on July 22, 2013.  He was assigned to the Associate Title Clearance ("ATC") team and his duties consisted of reviewing and evaluating abstract and title documents, performing title searches and identifying and resolving title problems.  (Doc. 49, Ex. 1 at ¶¶ 8-9; Ex. 3 at 35:24-36:7).  The ATC team was supervised by team leader Yolanda Tatum, associate vice president of title clearance Jennifer Conte and vice president of title clearance Dan Studeny.  *Id.* at Ex. 1 at  ¶¶ 8-9, Ex. 3 at 35:24-36:7).  When hired, plaintiff was 59 years old.  *Id.* at Ex. 2 at ¶ 3.

**B.     Plaintiff's Reassignment**

Beginning in the summer of 2013, the workload on the ATC team dropped off and Quicken Loans began reassigning workers to other units. *Id.* at Ex. 1 at  ¶¶ 10-11.  On December 23, 2013, plaintiff was reassigned to the Title Clearance Liaison ("TCL") team and thus, became employed by Title Source.  *Id.* at Ex. 2 at ¶ 12.  His job duties on the TCL team consisted of contacting third parties to obtain information to assist in clearing title issues.  *Id.* at Ex. 1 at ¶  12.  At the time of his reassignment, three other workers were also reassigned to the TCL team, two Caucasian woman and one African American man.  *Id.* at Ex. 1-A.  After his transfer, his job duties, title, pay and reporting relationship remained the same.  *Id.* at Ex. 1 at ¶ 15.  He continued to report to team leader Tatum, but he also began reporting indirectly to TCL team leader Kim Cislo.  *Id.* at ¶ 14, Ex. 3 at 36:13-21.

-2-

In January, 2014, plaintiff began looking for a position outside the TCL team. *Id.* at ¶¶ 16-17. Conte and Studeny offered plaintiff a position on a trial basis as a report analyst. *Id.* at ¶ 25. Defendants claim that position amounted to a promotion with more advancement opportunities but it is not clear if the position would have paid more. *Id.* Plaintiff declined the offer and stated his desire to work as senior director of operations in the Title Clearance ("TC") unit. *Id.* at ¶¶ 25-26. In March, 2014, Conte learned that plaintiff was dating team leader, Kim Cislo, of the TCL team. *Id.* at ¶ 27.

As a result, on March 12, 2014, defendants transferred plaintiff to the TC unit as an analyst and he retained his same pay and bonus eligibility. *Id.* at ¶¶ 27-30. Plaintiff claims that he never had a reporting relationship to Cislo, but always reported to Tatum. After his transfer to the position of TC analyst, plaintiff retained similar job responsibilities of evaluating and resolving title issues on title commitments or title searches. *Id.* at ¶ 31. He reported to Tatum and team captain Kasey Lopez. *Id.* at ¶ 30. At his deposition, plaintiff testified that in his new position as TC analyst, he was subjected to heightened scrutiny by Tatum and Lopez, who increased his workload, subjected him to unreasonable expectations, and otherwise harassed him. *Id.* at Ex. 7 at 122:1-12. In support of his claim that his workload was greater than other TC analysts, he relies solely on his own deposition testimony and copies of e-mails that he, himself, sent to his supervisors complaining that he was being expected to process more loans than other analysts in his unit. (Doc. 69, Ex. J). Beyond his own testimony and e-mails he drafted, plaintiff has not come forward with any documents, deposition testimony, or any other evidence showing that defendants' expectations for him exceeded their expectations for similarly situated analysts.

**C.     Plaintiff's Complaint of Discrimination**

On March 17, 2014, plaintiff filed a written complaint of age, race, and gender discrimination to Conte and human resources team relations specialist Diane Sakowski. (Doc. 49, Ex. 1 at ¶ 36; Ex. 3 at 184:7-23; Ex. 7 at 98:15-25, Doc. 49, Ex. 8 at ¶ 5, Ex.8-A)[1]. Sakowski met with plaintiff to discuss his concerns on March 20, 2014. *Id.* at Ex. 8 at ¶ 8. In addition to his concerns of discrimination, plaintiff alleged that he was transferred to the TC unit in retaliation for dating TCL team leader Cislo. *Id.* at Ex. 8 at ¶ 8, Ex. 8-B, Ex. 8-C, Ex. 11). He further claimed he was subject to harassment for turning down the report analyst position. *Id.* Sakowski investigated plaintiff's allegations but found them to lack merit. *Id.* at Ex. 8 at ¶ 9-10.

**D.   Investigation of Plaintiff's Improper Use of Personal E-Mail**

On March 20, 2014, Lopez sent plaintiff an e-mail containing confidential client names and phone numbers which plaintiff forwarded to his personal e-mail account. *Id.* at Ex. 3 at 135:9-136:16, Ex. 17). Alerted to this conduct, Lopez contacted Conte, who, in turn, contacted Sakowski. *Id.* at Ex. 1 at ¶ 34. Conte opened an investigation and discovered that beginning in July, 2013, plaintiff had sent 988 internal e-mails sent from either his Quicken Loans or Title Source e-mail accounts to outside e-mail accounts, including his personal e-mail. *Id.* at Ex. 8 at ¶¶ 12-14, Ex. 18. According to Sakowski's affidavit, of those 988 e-mails, over 100 contained confidential internal or client information, including client names and loan numbers, discussions of personal client information, lien and judgment amounts, details of clients' divorce proceedings, bankruptcies and estate

---

[1]According to plaintiff's response brief, plaintiff filed his complaint of discrimination on March 24, 2014. In support of this claim, plaintiff attached a copy of his complaint to Conte. (Doc. 69, Ex. M). The document attached, however, is undated. The six day time difference is irrelevant to a determination here.

administration.  *Id.* at ¶¶ 15-16, Ex. 8-H.  Plaintiff claims that defendants permitted him to use his home computer to perform his work related tasks, that he never sent anything marked "confidential, sensitive, or proprietary," and that he never sent any information to his personal e-mail account that would permit access to a client's account.  (Doc. 69 at 11-14).  Plaintiff further claims that the e-mail went through defendants' encrypted server and defendants cannot show any damages caused by the use of his personal e-mail.  *Id.* at 14.  Plaintiff also argues that in deciding his case against defendants before the NLRB, the administrative law judge ("ALJ") assigned to that case found that defendants' definition of "confidential and proprietary" information was overly broad.  *Id.* at 12-14.  Moreover, plaintiff claims that "permission was implicitly granted by the Company authorizing Plaintiff to work from home."  *Id.* at 14.

**E.    Plaintiff's Suspension and Termination**

On March 24, 2014, Sakowski met with plaintiff and suspended him for violating defendants' policy that employees not distribute confidential information outside the company, including to personal e-mail accounts.  (Doc. 49, Ex. 8. at ¶¶ 8-21).  At their meeting, plaintiff admitted he had sent the e-mails to his personal account, and his only explanation for doing so, was his desire to collect favorable e-mails to be used in applying for promotions.  *Id.* at ¶ 23.  The day after their meeting, plaintiff sent Sakowski an e-mail claiming that he had worked overtime, which he had not reported, for which he had not been paid.  *Id.* at ¶ 27, Ex. 22.  Shortly thereafter, on March 26, 2014, Sakowski notified plaintiff by telephone that he was being terminated effective April 1, 2014 for violating the company's policies regarding safeguarding confidential and proprietary information.  *Id.* at

¶ 28.  Human resources sent plaintiff a termination letter that same day reiterating the reason for his discharge.  *Id.* at Ex. 21.

In his response, plaintiff argues that defendant's explanation of the March 24, 2014 meeting is incorrect, that Sakowski never discussed a "disregard of data privacy concerns" as the basis for his termination, and that she told him the reason for his discharge was his relationship with Cislo.  The termination letter drafted by Title Source's chief human resources officer, however, states quite clearly:

> As we discussed on March 24, 2014, we thoroughly investigated your complaint concerning age/sex/race discrimination and your claim of unfair treatment due to a personal relationship that you have with a leader.  That investigation did not reveal any discrimination or retaliation.  It did, however, reveal serious violations of Company policies, including your use of your Company computer/e-mail to send confidential and proprietary Company information to your personal e-mail account.  You have sent hundreds of e-mails containing client names, loan numbers and other client information to your personal e-mail account.  You have also sent to your personal e-mail address Company e-mails containing information about business trends/numbers, and the average time to clear a loan and other confidential and proprietary topics.

*Id.*

## F.    Plaintiff's Overtime Claim

After his suspension, on March 25, 2014, plaintiff sent an e-mail to Sakowski complaining that he was required to work overtime without proper compensation.  (Doc. 69, Ex. O).  Associate corporate counsel of Quicken Loans Rebecca Simpkins responded on the same date:

> I am investigating your statement that you performed work without being paid.  As you know from the Handbook, discussions at team huddles, and from your orientation, performing work that you don't record in your time submission is specifically prohibited.  Team members must accurately and completely record, submit and report all hours actually worked.  Team

members have been disciplined and even terminated from employment for violating this rule.

*Id.* Some six months after his termination, plaintiff sent another e-mail to Simpkins complaining that he had worked an average of twelve hours of overtime every week throughout his employment for defendants. *Id.* At his deposition in this case, plaintiff admitted that he never reported these hours to management prior to his termination, was never told to work overtime without reporting it, and whenever he did report overtime worked, he was paid for it. (Doc. 49, Ex. 3 at 56:20-57:24, 58:16-23; Ex. 7 at 11:8-12:9, 26:3-27:5, 28:6-13).

Just nine months after he was first hired by Quicken Loans, plaintiff was terminated on April 1, 2014. *Id.* at Ex. 21.

## G.    Plaintiff's Lawsuit

Plaintiff claims reverse race and gender discrimination based on his status as a while male under Title VII and ELCRA, age discrimination under the ADEA, retaliation for filing a claim of discrimination and in retaliation for initiating discussions with a union, and claims defendants failed to pay him overtime compensation due under the FLSA. Plaintiff also claims retaliation under the ADA, although defendant has not alleged any disability, thus, this claim shall be summarily dismissed.

## II. Standard of Law

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See*

*Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence

-8-

supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

### III. Analysis

### A.    Race and Gender Discrimination

Because plaintiff relies solely on circumstantial evidence to support his race and gender discrimination claims, the familiar *McDonnell Douglas* burden shifting analysis applies. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under that analysis, plaintiff must first establish a *prima facie* case under this statute by showing (1) he is a member of a protected class, (2) he was qualified for the job and performed it satisfactorily, (3) despite his qualifications and performance, he suffered an adverse employment action, and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). Should plaintiff satisfy the above elements, defendant has the burden of proving a legitimate, nondiscriminatory business reason for rejecting plaintiff. *Jackson v. VHS Detroit Receiving Hosp.*, 814 F.3d 769, 776 (6th Cir. 2016). Then, if defendant meets this burden, plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by defendant were a pretext for discrimination. *Id.*

In order to prove reverse discrimination, it is not enough for a plaintiff to satisfy his traditional prima facie case under the *McDonnell Douglas* framework.   Reverse discrimination claims require a different and more difficult burden of proof.  Plaintiff must

-9-

come forward with more by showing that "background circumstances support the suspicion that defendant[s] [are] that unusual employer who discriminates against the majority." *Briggs v. Potter*, 463 F.3d 507, 517 (6th Cir. 2006) (internal quotation marks and citation omitted); *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (applying analysis to ELCRA claims).  Defendants have submitted proof that plaintiff's colleagues and managers were a diverse group of individuals, male and female, of all ages, and different races.  (Doc. 49, Ex. 2 at ¶ 9, Ex. G).  Plaintiff attempts to meet his burden of proof by arguing that prior to his termination, defendants transferred two other older Caucasian men, Roger Konkel and Ed Kmiecik, out of his department, although they were among the top performers in the unit.  (Doc. 69, Ex. H).  Plaintiff has not shown that defendants had any ill motive in these transfers as transfers were commonplace at Quicken and Title Source and plaintiff has not shown that these transfers were demotions.   Even if these two transfers were sufficient to support the inference that defendants are the unusual employers who discriminate against white men, defendants are still entitled to summary judgment on the reverse race and gender discrimination because plaintiff has failed to establish his prima facie case.  Plaintiff has failed to show that similarly situated employees were treated more favorably than him for the same misconduct.   In order to be similarly situated, the employees must have engaged in misconduct of comparable seriousness. *Jackson*, 814 F.3d at 777.  The allegedly similarly situated employees must have "engaged in the similar conduct, without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *McMillan v. Castro*, 405 F.3d 405, 413 (6th Cir. 2005).  Defendants claim they discharged plaintiff for sending over 900 e-mails outside the company, including over 100 containing confidential client

information.   Plaintiff claims an African American female employee, Yolanda Tatum, engaged in similar misconduct but was not terminated.  The proofs do not bear this out.  The only e-mail Tatum sent outside the company was an e-mail she sent to the plaintiff when she hit "reply all" on her  e-mail account, causing an e-mail to be sent to plaintiff because he had first sent her an e-mail from his personal account.  Clearly, this isolated act, triggered by plaintiff's own misconduct, is not comparable to plaintiff's repeated and flagrant violation of defendants' policies.

Plaintiff also claims his transfers to the TCL and later to the TC team are evidence of discrimination, but plaintiff conceded at his deposition that frequent job transfers are commonplace at both Title Source and Quicken Loans.  (Doc. 49, Ex. 3 at 209:6-210:6).  At the time plaintiff was reassigned to the TCL team, many other ATC members of all ages, races, and genders were also transferred there.  *Id.* at Ex. 1 at ¶ 10; Ex. 2 at ¶ 9, Ex. 2-G).  Similarly, plaintiff's reassignment to the TC team is explained by a non-discriminatory reason.  He was transferred off the TCL team because he was dating its team leader which posed an obvious conflict of interest.  *Id.* at Ex. 1 at ¶¶ 27-29; Ex. 8 at ¶ 20).

Finally, even if plaintiff could establish his prima facie case, which he has not, defendants have come forward with evidence that his termination was for a legitimate non-discriminatory reason, and plaintiff has not shown that the reason given was pretextual to hide unlawful discrimination.  Defendants have demonstrated that plaintiff was fired for sending hundreds of company e-mails, many of which included confidential client information, to his personal e-mail address.  Plaintiff has not rebutted this evidence with anything to prove otherwise.

-11-

Plaintiff claims that at the March 24, 2014 meeting, Sakowski told him the reason for his dismissal was his personal relationship with Cislo. He claims this reason was pretext for discrimination because he was terminated, but Cislo was not. *Id.* at Ex. 8 at ¶ 20. According to Sakowski's affidavit, she discussed plaintiff's personal relationship with Cislo at that meeting, in response to his complaints that he was moved from the TCL team but Cislo was not. (Doc. 49, Ex. 8 at ¶ 20). Sakowski explained that he was moved based on the conflict of interest caused by his personal relationship with a supervisor and he was provided with a copy of company policies on conflicts of interests. *Id.* At his suspension meeting with Sakowski, she informed him that he was being investigated for dissemination of confidential information via email. *Id.* at ¶ 21. Although Sakowski's affidavit confirms that she discussed the conflict of interest caused by plaintiff's personal relationship with Cisco at the suspension meeting, it is undisputed that the reason given for his dismissal as set forth in his March 26, 2014 discharge letter, quoted above, was plaintiff's misuse of confidential client information.

Defendants rely on the affidavit of Yasmeen Jasey, the Director of Team Relations for Quicken Loans, who states that plaintiff was specially trained not to send non-public information to an e-mail account. *Id.* at Ex. 2 ¶ 6. Specifically, plaintiff attended security training on December 27, 2012, in which power point slides presented clearly stated, "You must not forward company e-mail to external e-mail addresses if it contains non-public information." *Id.* at Ex. 2-C. Likewise, other training materials plaintiff received at a new team member orientation in August, 2013, stated:

> You shall not disclose, reveal or expose any Proprietary/Confidential Information to any person, business, or entity (nor forward or disseminate

> such information to person outside the Company or to a personal email
> account.)

*Id.* at Ex. 2 at ¶ 7, Ex. D-2.  Also, plaintiff signed an employment agreement with Quicken

on July 15, 2013 acknowledging receipt of the above prohibition.  *Id.* at Ex. 2-F.  The Sixth

Circuit has recognized that an employee's dissemination of confidential materials is a

legitimate non-discriminatory reason for termination.  *Niswander v. Cincinnati Ins. Co.*, 529

F.3d 714, 728-29 (6th Cir. 2008).

Plaintiff claims the reason given for his termination is factually false because (1) he

was given permission to work on his home computer, (2) he did not send client credit card

numbers, social security numbers, or identification numbers or passwords in connection

with a client's name, address or telephone number that would allow direct access to a

client's account, and thus, did not violate defendants' security policies, and (3) the ALJ who

presided over the NLRB action invalidated portions of defendants' confidentiality rules as

overly broad.  None of these arguments support plaintiff's claim that the reason given for

his termination was pretext to disguise discrimination.

First, the fact that plaintiff was allowed to work from home on the company's secure

network does not undermine his employer's rule that non-public information could not be

sent to a personal e-mail address.  Second, plaintiff's argument that he did not breach

defendant's confidentiality rules because the rules should be very narrowly construed is not

supported by the record.  As discussed above, plaintiff was on notice of the confidentiality

provisions which were broadly drafted.  Also, Sakowski stated in her affidavit, plaintiff sent

to his personal e-mail account client names and loan numbers, discussions of personal

client information, lien and judgment amounts, and details of clients' divorce proceedings,

bankruptcies, and estate administration. (Doc. 49, Ex. 8 at ¶ 16, Ex. 8-H) . Copies of those emails are part of the record. *Id.* at Ex. 8-H. Plaintiff admitted to Sakowski that he had sent the confidential materials to his personal email address. *Id.* at Ex. 8 at ¶ 21.

Finally, plaintiff's argument that he could not be terminated for violating his employer's confidentiality rules because the ALJ in the NLRB action found some of those rules to be overly broad is of no moment. The issue is whether the reason given was the true reason for the discharge, or whether it was pretext for discrimination or retaliation. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012).

Moreover, defendants are entitled to summary judgment based on the honest-belief doctrine. Under the honest-belief rule, an employer may "'avoid a finding that its claimed nondiscriminatory reason was pretextual' if the employer 'can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" *Richardson v, Wal-Mart Stores*, __ F.3d __, No. 15-1142, 2016 WL 4709865, at *7 (6th Cir. Sept. 9, 2016) (citations omitted). The Sixth Circuit has explained that the employee cannot rebut the employer's invocation of the honest-belief rule by merely showing a dispute of the facts on which the discharge was based, but must put forth evidence showing that the employer did not honestly believe in the proffered non-discriminatory reason for the termination. *Id.* (citations omitted). Plaintiff has not met that burden here. For these reasons, defendants are entitled to summary judgment on plaintiff's reverse race and gender discrimination claims.

## B.   Age Discrimination

When an age discrimination claim is based on circumstantial evidence, the court employs the same *McDonnell Douglas* framework used in race and gender discrimination

-14-

claims. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a prima facie case of age discrimination, plaintiff must show that he (1) was a member of a protected class of persons (i.e. persons 40 years of age or over), (2) was discharged, (3) was qualified for the position held, and (4) was replaced by someone outside of the protected class. *Minadeo v. ICI Paints*, 398 F.3d 751, 764 (6th Cir. 2005). Even if plaintiff could show his prima facie case, for the same reasons discussed above, he cannot show that defendants' legitimate reason for firing him was pretext for discrimination.

This is not the typical age discrimination case where a long time employee claims discrimination began as he or she aged. Rather, plaintiff was first hired when he was 59 years old, a fact which contradicts plaintiff's allegation that defendants disliked older workers. Plaintiff also argues that he requested a demographic report that would have shown the average age of an employee at Quicken and Title Source was 29 years old but his request was denied. (Doc. 69 at 19). Even if such statistics exist, the fact that most of defendants' employees were younger than plaintiff is not evidence that his employer discriminated against him. The Sixth Circuit has ruled that in order for statistics about the average age of those hired to have significance, there must be evidence "regarding qualified potential applicants from the relevant labor market" as there must be evidence that there were "qualified older employees who were available or applied for those jobs." *Simpson v. Midland Ross Corp.*, 823 F.2d 937, 943-44 (6th Cir. 1987) (finding statistical evidence regarding the age of employees hired following plaintiff's discharge lacked probative value absent additional information from which to infer discrimination). *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000) (statistics about percentage of

minority supervisors not relevant to issue of whether employer terminated plaintiff based on race); *Kier v. Commerical Union Ins. Cos.*, 808 F.2d 1254, 1258 (7th Cir. 1987) (statistical evidence relating to the employer's practice of hiring younger workers to replace those retiring or leaving irrelevant in discriminatory discharge case).

In addition, plaintiff seeks to rely on two stray remarks to support his age discrimination claims. The first comment was made before he was hired by Quicken Loans and Title Source by some unidentified individual, who may have not even been employed by defendants, who told him that if defendants converted him from being a contract employee for Aerotek to a Quicken employee, he would be the "Old Man of the Sea." (Doc. 49, Ex. 7 at 69:20-71:8). An ad-lib comment by an individual plaintiff could not identify, about plaintiff's odds of being hired given his age, is completely unrelated to his discriminatory discharge claim. Not only is the comment irrelevant, but plaintiff was hired, thus, debunking whatever inference that could be drawn from the comment regarding defendants' hiring practices, which, in any event, are not at issue here.

The second comment was made by Sakowski who responded to his complaint that his work area was too loud and allegedly observed that "Hugh, you and I, we're old school." (Doc. 49, Ex. 3 at 33:17-23; Ex. 7 at 67:16-21, 69:20-71:8). Courts have recognized that "[d]iscriminatory remarks by decision makers and those who significantly influence the decision-making process" may amount to direct evidence of discrimination. *Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013). Comments that are "general, vague, or ambiguous," however, do not constitute direct evidence. *Id.* (quoting *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008)) (internal quotation marks omitted).

Moreover, "'statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden of demonstrating animus.'" *Richardson*, 2016 WL 4709865, at *4.  In this case, Sakowski's offhand comment that she and plaintiff were both "old school" was merely a stray remark, unrelated to the decision to terminate him, and does not evidence discriminatory intent on her part.

Plaintiff has failed to rebut his employer's stated reason for firing him, the misuse of confidential client information through the improper use of his personal e-mail, as he has not shown that the stated reason "(1) had no basis in fact, (2) did not actually motivate [his employer's] challenged conduct, or (3)  was insufficient to warrant the challenged conduct." *Id.* at *5 (internal citation and quotation marks omitted).

## C.      Retaliation Claims

The court turns now to plaintiff's claim he was discharged in retaliation for his filing an internal grievance to management on March 17, 2014, alleging race, gender, and age discrimination.  (Doc. 1 at 3).[2]   Title VII prohibits an employer from retaliating against an employee "because he has made a charge" of discrimination.  42 U.S.C. § 2000e-3(a). Michigan's ELCRA includes a similar provision, *see* MCL § 37.2701(a) which is analyzed under the same standard.  *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 627 (6th Cir. 2013). As with a discrimination claim, a plaintiff can prove retaliation with direct or circumstantial

---

[2]Plaintiff also claims that he was terminated in retaliation for his efforts to start a union.  Such a claim is not properly before this court as such a claim is preempted and within the exclusive jurisdiction of the National Labor Relations Board.  *See* 29 U.S.C. §§ 153(d); *Mayer v. Orman*, 391 F.2d 889, 891 (6th Cir. 1968).

evidence.  Here, plaintiff proceeds by relying on circumstantial evidence; thus, the court, again, analyzes the claim under the *McDonnell Douglas* framework.

Under that paradigm, plaintiff has the initial burden to establish a prima facie case of retaliation under Title VII and the ADEA by establishing that: (1) he engaged in protected activity when he made his discrimination complaint; (2) defendant knew about his exercise of the protected activity; (3) defendant thereafter took adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (citing *Weigel v. Baptist Hosp.*, 302 F.3d 367, 381 (6th Cir. 2002)).  If Plaintiff establishes a prima facie case, the burden of production shifts to defendant to "articulate some legitimate, nondiscriminatory reason for [its action]." *McDonnell Douglas*, 411 U.S. at 802.  If Defendant succeeds in doing so, then the burden shifts back to Plaintiff to demonstrate that Defendant's "proffered reason was not the true reason for the employment decision." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491-92 (6th Cir. 2010) (internal quotation marks and citation omitted).

According to his Complaint, plaintiff was notified of his termination on March 27, 2014, effective April 1, 2014.  Based on the proximity in time between his complaint to management in late March, 2014, and his termination, plaintiff alleges he has proven retaliatory discharge.  The law is well settled, however, that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim.  *Id.* at 494 (citing *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007)). The Sixth Circuit has recognized, however, that there are circumstances, where temporal proximity combined with other evidence of retaliatory conduct, such as proof that a plaintiff was

-18-

treated differently than other employees, may establish causation. *Id.* But where an employer comes forward with proof that it had an intervening legitimate reason to take an adverse employment action against the plaintiff, this dispels whatever inference might be gleaned from the temporal proximity of the adverse employment action and the employee's complaints of discrimination. *Kuhn,* 709 F.3d at 628. Here, defendants claim that no inference can be drawn from the temporal proximity because it was plaintiff's internal complaint that first put defendants on notice that plaintiff was sending confidential client information to his personal e-mail account.

Plaintiff also argues that an e-mail from Bill Emerson, Quicken's Chief Executive Officer, is evidence that defendants have "a limited awareness of laws prohibiting discrimination and retaliation." (Doc. 69 at 19-20). That e-mail provides:

> The complaint to the NLRB was made by Hugh MacEachern, a former team member, who has filed numerous misguided and ridiculous complaints against Quicken Loans and Title Source, including that he was discriminated against during his time with the company, perhaps a first for a white male. Needless to say the claims are baseless. All of MacEachern's complaints have been summarily dismissed as laughable.

*Id.* at Ex. Q. Because the NLRB upheld some of plaintiff's charges, plaintiff argues that Emerson's e-mail was misplaced and could have a chilling effect on others wishing to complain of discrimination. Even if plaintiff's allegation that Emerson's e-mail would cause other white males or other victims of perceived discrimination to be deterred from bringing claims against defendants, this still does not support plaintiff's claim that he, himself, was the victim of discrimination or retaliation here. Plaintiff's bald-faced claim that Emerson's e-mail and  defendants' decision to terminate him demonstrates a "continuing pattern of arrogance, insensitivity, absolute lack of regard for the Plaintiff's well being, and an

unwillingness to remedy the outcomes from their unlawful actions even though they have the overwhelming resources to do so," *id.* at 22, is not supported by any evidence.  For these reasons, defendants are entitled to summary judgment on plaintiff's retaliation claims.

## D.   Overtime Claim

Plaintiff claims he worked approximately twelve hours of overtime per week for which he was never compensated.  It is undisputed that plaintiff first brought his alleged overtime claim to defendants' attention on March 25, 2014, the day after his suspension, when he sent an e-mail to Sakowski seeking compensation for overtime in what would become his final paycheck.  (Doc. 49, Ex. 22).  In that letter, plaintiff stated that his alleged overtime could be confirmed by checking video surveillance tapes and parking garage records.  *Id.* Six months later, on September 24, 2014, plaintiff also wrote to defendants' associate general counsel, Rebecca Simkins, stating that he was waiting to hear on his overtime claim and again reiterating that defendants could verify his claim by considering surveillance video, badge swipes in the building and parking garage and speaking to witnesses.  (Doc. 69, Ex. 0).

Defendants move for summary judgment on plaintiff's FLSA claim for overtime compensation on the grounds that they had policies in place for recording overtime, and it is undisputed that when plaintiff complied with those policies and reported additional hours worked in excess of 40 hours, he was paid for that time.  (Doc. 49, Ex. 3 at:7:13-8;25 Ex. 2 at ¶ 4, Ex. 2-A, Ex. 23).  In fact, of the eighteen pay periods plaintiff worked, he was paid overtime twelve times, and in four of those periods, plaintiff was paid for over seven hours of overtime.  *Id.* at Ex. 2-A.  Conversely, defendants submit that plaintiff is barred from recovering overtime compensation for hours he never notified his employer he

allegedly worked.  Plaintiff does not dispute that he never reported the specific overtime hours for which he now claims compensation is due to his employer.  Instead, he relies solely on his general complaint to management, lodged after his suspension, that he worked an average of twelve hours of overtime a week for which he was not paid.  (Doc. 69, Ex. O).  Plaintiff argues that where an employer does not maintain adequate records, the employee is entitled to recover a good faith reasonable estimate of the time worked.  Plaintiff's statement of the law is true; however, this is not a situation where the employer failed to keep adequate records.

Here, there were clear policies and procedures in place and plaintiff was specifically trained to report all hours worked for which he was not paid.  (Doc. 49, Ex. 2 at ¶ 7).  The Sixth Circuit has explained that "if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process." *White v. Baptist Mem. Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012).  Here, there were time recording measures in place yet plaintiff failed to comply with them.  Plaintiff argues that it is the employer's duty to verify the additional time he now claims he worked by looking at video surveillance of the building and parking lot, interviewing employees, and checking badge swipes.  Plaintiff has misstated his employer's burden.   Where the employer maintains well delineated procedures for recording time worked, such as those that existed here, the employee is duty bound to comply with those procedures.  Contrary to plaintiff's argument, the employer is not required to act as a private detective to review video surveillance cameras and to employ other clandestine means such as interviewing plaintiff's co-workers or possibly maintenance workers, to document the hours plaintiff worked.

-21-

Plaintiff claims his employer knew he was working overtime because he was not able to complete his tasks in a normal work week, he was on a first name basis with the maintenance crew, he often had to sprint through the parking lot to exit the garage before it closed at midnight, and some members of management saw him at his desk after hours. None of these facts, even if true, support plaintiff's overtime claim. There is no evidence that members of management who saw him working after hours knew that he was not reporting those additional hours worked. Given that plaintiff reported overtime in the majority of pay periods that he worked, it certainly would be reasonable for his superiors to assume he was reporting all of his overtime.

Finally, the court considers plaintiff's argument that defendants are liable for violating the FLSA because they allegedly threatened to retaliate against him if he reported their alleged non-compliance with the FLSA. In support of this retaliation claim, plaintiff relies on Simkins' letter which provides:

> I am investigating your statement that you performed work without being paid. As you know from the Handbook, discussions at team huddles, and from your orientation, performing work that you don't record in your time submission is specifically prohibited. Team members must accurately and completely record, submit and report all hours actually worked. Team members have been disciplined and even terminated from employment for violating this rule.

(Doc. 69, Ex. R). The above quoted excerpt merely shows that defendants maintained procedures for recording time worked for which plaintiff failed to comply. The excerpt does not support plaintiff's retaliation theory. For these reasons, plaintiff's overtime claim must be summarily dismissed and summary judgment shall enter for defendants.

### IV. Conclusion

-22-

For the reasons set forth above, defendants' motion for summary judgment (Doc.

49) is GRANTED.  Plaintiff's cross-motion for summary judgment (Doc. 69) is DENIED AS

MOOT.

**IT IS SO ORDERED**.

Dated:  September 21, 2016

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 21, 2016, by electronic and/or ordinary mail and
also on Hugh MacEachern, 22126 Hayes Street,
Taylor, MI 48180-2422

s/Barbara Radke
Deputy Clerk